C. E. MURRAY, Plaintiff and Appellant, *v.* TABACALEROS DE BAYAMÓN, INC., Defendant and Appellee; LEOPOLDO SANTIAGO CARMONA, Intervener and Appellee. ALONSO RIERA & CO., INC., Plaintiff and Appellant, *v.* TABACALEROS DE BAYAMÓN, INC., Defendant and Appellee; LEOPOLDO SANTIAGO CARMONA, Intervener and Appellee.

Nos. 5104 and 5105. Argued March 18, 1931.—Decided March 11, 1932.

*Feliú & La Costa* for appellants. *E. Igaravídez* for appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

These actions were brought by Alonso Riera & Co., Inc., and C. E. Murray, against Tabacaleros de Bayamón, Inc., to

recover a money judgment. Leopoldo Santiago Carmona, a warehouseman, intervened in both cases. The evidence heard was identical in both cases and all the questions involved we[r]e considered by the district court in a single opinion. The appeals were jointly heard and they will also be considered and decided together by us.

In order to secure any judgment that might be rendered for the plaintiff in the action brought by Alonso Riera & Co., Inc., an attachment was decreed on property belonging to defendant Tabacaleros de Bayamón, Inc., and in compliance therewith the marshal attached as the property of said defendant 39 barrels of stripped tobacco, all marked and numbered, with a net weight of 46.80 hundredweight, valued at $3,276; and similarly in the action brought by C. E. Murray, 31 barrels of stripped tobacco, all likewise marked and numbered, with a net weight of 37.20 hundredweight, valued at $2,604, were attached.

The above attachment gave rise to the intervention proceedings wherein were raised the only questions to be decided by us in the present appeals. The defendant and appellee was adjudged to pay the sums claimed, less a small reduction made in one of the cases, but failed to appeal. However, the attachment decreed and levied at the request of the plaintiffs was set aside when the complaint in intervention was finally determined, and the said plaintiffs took an appeal to this Court.

Nine errors are assigned in their brief, applicable to both appeals. Two of them relate to the intervention, four to the hearing of the evidence, two to the weighing of the evidence, and one generally to the rendering of the judgment.

Let us examine the first two. By them it is maintained that Santiago Carmona was not entitled to intervene in the actions and that neither of the complaints which he was allowed to file stated facts sufficient to establish a case for relief.

The intervener alleged that he was a public warehouseman under Act No. 36 of 1925, with warehouses in operation in the municipal district of Bayamón; that in accordance with the law he received leaf tobacco from several depositors of the 1926–27 crop, among whom was not included defendant Tabacaleros de Bayamón, Inc., and issued to them the proper receipts, thereby binding himself to deliver forthwith the tobacco on presentation of the said receipts, which are documents negotiable by indorsement; that he had furnished bond in the sum of $20,000 upon which suit could be brought, as provided by law, by any one whom he might injure in the exercise of his trade as a public warehouseman; that at this stage, within these two actions, the marshal of the District Court of San Juan proceeded to and did attach as belonging to the defendant—which was not true—the tobacco mentioned by us at the beginning of this opinion, seizing the same and removing it from the warehouse, thus preventing the intervening warehouseman from making delivery, as was his duty, to the depositors or holders of the warehouse receipts, and subjecting him to the risk of being liable for the resulting damages. He further alleged that according to his information and belief the receipts issued by him had been surrendered as a pledge to the Federal Intermediate Credit Bank of Baltimore.

The complaints in intervention are actually more extensive and detailed, but the summary which we have just made of them is sufficient for the conclusion that the district court did not err in allowing the filing thereof in the actions in which the attachments had been decreed and levied, and in deciding afterwards that they stated facts sufficient for granting the relief that was sought thereby, namely, the setting aside of the attachment and the return to the public warehouse owned by the intervener of the attached tobacco.

The entire lengthy discussion contained in the brief of the appellants regarding the construction to be given to section 72 of our Code of Civil Procedure, the existence in

our procedural system of intervention proceedings, and the cases of *Mari* v. *Mari*, 26 P.R.R. 603, and *Lessesne* v. *P.R. Drug Co.*, 39 P.R.R. 852, becomes superfluous in view of the decision of this Court in *Casanova* v. *Municipal Court*, 41 P.R.R. 842—844, where it was said:

"Section 72 of the Code of Civil Procedure provides as follows:

" 'Any person may, before the trial, intervene in an action or proceeding, who has an interest in the matter in litigation, in the success of either of the parties, or an interest against both. An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claim of what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and the defendant, and is made by complaint, setting forth the grounds upon which the intervention rests, filed by leave of the court, and served upon the parties to the action or proceeding who have not appeared, and upon the attorneys of the parties who have not appeared, who may answer or demur to it as if it were an ordinary complaint.'

"In *Mari* v. *Mari*, 26 P.R.R. 603, the contention was that a creditor with a lien on property attached had not right of intervention. The origin of intervention, as a civil law remedy, was traced from Louisiana to California from which state our own statute was indirectly taken. We accepted the doctrine from 2 R.C.L. 882 that not only does the right exist for the test of ownership of property attached, but also for one who has a lien on the same. We cited numerous authorities to the same effect and among them *Potlatch Lumber Co.* v. *Runkel*, 16 Idaho 192, annotated in 23 L.R.A. (N.S.) 536; *Dennis* v. *Kolm*, 131 Cal. 92, is likewise applicable.

"Although not relied upon by either court, there are dicta in *Lessesne, etc.*, v. *Porto Rico Drug*, 39 P.R.R. 852, that might seemingly support the conclusion reached by them in this case. However, the essential matter therein involved, as shown by the facts and the citations was that an unsecured creditor had no right of intervention to reach the property already attached. We adhere to the position taken in *Mari* v. *Mari, supra*. See also *Pabón* v. *Solivellas & Co. et al.*, 26 P.R.R. 206. In *Potlatch* v. *Runkel, supra*, it was held that the fact that the proposed intervener had some other and adequate remedy for the protection of his rights was no bar

to his right to intervene. We accept that principle, unless there is something in the Act of 1907 which showed an intention in whole or in part to repeal section 72 of the Code of Civil Procedure. Implied repeals are not favored. The Act of 1907, (Comp. St., 1911, Sec. 5260), in this regard provides:

" 'That whenever any marshal or other lawful officer shall levy a writ of execution, attachment or other like writ upon any movable property, and such property or any part thereof, shall be claimed by any person who is not a party to such writ, such person or his agent or attorney may make oath in writing before any officer authorized to administer oaths that such claim is made in good faith, and present such oath to the officer who made such levy.'

"We find nothing therein that expressly or even indirectly causes a repeal of section 72 of the Code of Civil Procedure. The two remedies can stand together."

The intervener's interest is clear. Section 16 of Act No. 36 of 1925 (Session Laws, pp. 220–230), that is, the Puerto Rico Warehouse Act, reads as follows:

"Section 16.—*Receipts.*—For all agricultural products stored for Island, interstate or foreign commerce, in a warehouse licensed under this Act, an original receipt shall be issued by the warehouseman conducting the same, but no receipts shall be issued except for agricultural products actually stored in the warehouse at the time of the issuance thereof."

The pertinent sections of Act No. 9 of 1918 (Session Laws, p. 22), to make uniform the law of warehouse receipts, that must be "so interpreted and construed as to effectuate its general purposes to make uniform the law of those States and Territories which enact it" (section 57), provide:

"Section 1.—Warehouse receipts may be issued by any warehouseman.

" '  *        *        *        *        *        *        *

"Section 5.—A receipt in which it is stated that the goods received will be delivered to the bearer, or to the order of any person named in such receipt is a negotiable receipt.

" '  *        *        *        *        *        *        *

"Section 37.—A negotiable receipt may be negotiated by delivery—

"(a) Where, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the bearer; or

"(b) Where, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of a specified person, . . .

"(*          *          *          *          *          *          *

"Section 38.—A negotiable receipt may be negotiated by the indorsement of the person to whose order the goods are, by the terms of the receipt, deliverable. Such indorsement may be in blank, to bearer or to a specified person . . .

"Section 41.—A person to whom a negotiable receipt has been duly negotiated acquires thereby—

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value; . . .

"(b) The direct obligation of the warehouseman to hold possession of the goods . . . as if the warehouseman had contracted directly with him."

Section 20 of Act No. 36 of 1925, *supra,* says:

"Section 20.—*Delivery of stored products.*—A warehouseman conducting a warehouse licensed under this Act, in the absence of some lawful excuse, shall, without unnecessary delay, deliver the agricultural products stored therein upon a demand made either by the holder of a receipt for such agricultural products or by the depositor thereof, if such demand be accompanied by (a) an offer to satisfy the warehouseman's lien; (b) an offer to surrender the receipt, if negotiable, with such endorsement as would be necessary for the negotiation of the receipt and (c) a readiness and willingness to sign, when the products are delivered, an acknowledgment that they have been delivered, if such signature is requested by the warehouseman."

Section 8 of Act No. 9 of 1918, *supra,* prescribes:

"Section 8.—A warehouseman, in the absence of some lawful excuse provided by this Act, is bound to deliver the goods upon a demand made either by the holder of a receipt for the goods or by the depositor, if such demand is accompanied with—

"(a) An offer to satisfy the warehouseman's lien;

"(b) An offer to surrender the receipt if negotiable, with such indorsements as would be necessary for the negotiations of the receipt; and

"(c) A readiness and willingness to sign, when the goods are delivered, an acknowledgment that they have been delivered, if such signature is requested by the warehouseman.

"In case the warehouseman refuses or fails to deliver the goods in compliance with a demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal."

That the attachment did not lie is shown by the provisions of section 25 of the aforesaid Uniform Warehouse Receipts Act (No. 9 of 1918), which provides as follows:

"Section 25.—If goods are delivered to a warehouseman by the owner or by a person whose act in conveying the title to them to a purchaser in good faith for value would bind the owner, and a negotiable receipt is issued for them, they cannot thereafter while in the possession of the warehouseman, be attached by garnishment or otherwise, or be levied upon under an execution, unless the receipt be first surrendered to the warehouseman, or its negotiation enjoined. The warehouseman shall in no case be compelled to deliver up the actual possession of the goods until the receipt is surrendered to him or impounded by the court."

The jurisprudence construing statutes that are similar to ours is summarized as follows:

"Before the enactment of the uniform law relating to warehouses, it was established that a warehouseman, if acting in good faith, might deliver the stored property pursuant to judicial process, and when demand for the property was made by the bailor or his assignee, the warehouseman could justify under the process. But in yielding goods to the demand of the law, his behavior must be marked by the same care and prudence as any prudent man would exhibit in the case of a seizure of his own goods, property . . . Under the uniform warehouse receipts act, if a negotiable receipt has been issued for the goods, they are not subject to execution or attachment while in the possession of the warehouseman, unless the receipt is surrendered or its negotiation enjoined; and the warehouseman cannot be compelled to deliver up the actual possession of the goods until the receipt is surrendered to him or impounded by the court. Under such act, if the warehouseman delivers the goods pursuant to an attachment without requiring a surrender of the receipt, he may be liable as for a conversion." 27 R.C.L. 985.

As was properly stated by the learned trial judge in his opinion filed,—

"Warehouse receipts are almost exclusively used as security for loans or pledges and they constitute in themselves a token of said ownership whose integrity should be upheld and maintained at all times for the benefit of third persons who may have contracted with reference to said receipts and become the holders thereof."

The errors relating to the reception of the evidence are also nonexistent. It is urged in these assignments that the district court erred in admitting in evidence a certificate of the Commissioner of Agriculture and Labor, another of the Executive Secretary of Puerto Rico, the warehouse receipts, and the testimony of Noah Sheppard as to the warehouse receipts being in the possession of the Intermediate Credit Bank of Baltimore.

If the aforesaid certificates of the Commissioner of Agriculture and of the Executive Secretary had constituted the only proof to show that the intervener was a public warehouseman and that Tabacaleros de Bayamón, Inc., was a domestic corporation, the appellants might perhaps be right in view of the form in which the said documents were drafted; but both these facts appear to have been admitted, tacitly as well as expressly, in the record by the very party who assigns the errors which, if committed, would, for the reason stated, be harmless.

The warehouse receipts, issued according to law, were perfectly admissible, and Sheppard, as an employee of the bank, was fully qualified to testify as he did. The brief of the appellees fully answers the arguments of the appellants regarding such errors, and for us to stop and discuss them in detail would unnecessarily lengthen this opinion.

We have considered the facts held by the trial court to have been proved and, in our view, the same are supported by the evidence. Most of them have already been referred to by us when summarizing the complaints in intervention.

208

We will only add the following findings made so that the case may be fully stated in this opinion. They are as follows:

"It has been further proved that the stripped tobacco, deposited by the persons to whom the said 110 receipts have been issued, had been stripped under the supervision of witness Francisco Miranda and was the same tobacco to be found in the barrels attached by Marshal Urrutia.

"It has also been proved that when the said barrels of stripped tobacco in the warehouse where attached, the original warehouse receipts issued by the public warehouseman (Plaintiffs' Exhibits 1 to 110) were not surrendered by the marshal, nor were they presented for cancellation. The marshal testified 'that he did not see any such receipts.'

"It has not been shown that the negotiation of the receipts in question had been judicially enjoined or that the same had been impounded by the court at any time.

"Moreover, it has been proved that Francisco Miranda (in charge of the intervener's public warehouse) objected to the attachment and that despite his objection, the marshal made the levy."

Therefore, the court did not err in weighing the evidence; and from all the foregoing the conclusion is reached that the court did not err, either, in rendering the judgments appealed from, which must be affirmed.

Mr. Justice Aldrey concurs in the judgment.